**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

TANYA M. ZANDERS,                    :

     Plaintiff,                    :

vs.                    :          CA 16-0542-MU

NANCY A. BERRYHILL,                    :
Acting Commissioner of Social Security,
                                    :

     Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability, disability insurance benefits, and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 21 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 23 (endorsed order of reference)). Upon consideration of the administrative record, Plaintiff's brief, and the

Commissioner's brief,[1] it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

## I. Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on November 6, 2012 and protectively filed an application for supplemental security income benefits on November 27, 2012, both applications alleging disability beginning on May 30, 2009. (*See* Tr. 288-300.) Zanders' claims were initially denied on February 21, 2013 (Tr. 145-46 & 178-82) and, following Plaintiff's electronic request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 183-84), a hearing was conducted before an ALJ on February 9, 2015 (Tr. 112-32). During the hearing, Zanders amended her disability onset date to November 5, 2012. (*Compare* Tr. 115 *with* Tr. 95 ("During the hearing, the claimant amended her alleged onset date of disability to November 5, 2012. This motion is granted.")). On March 11, 2015, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to any social security benefits. (Tr. 95-106). More specifically, the ALJ concluded that Zanders retains the residual functional capacity to perform a limited range of light work and, further, that in light of her residual functional capacity, she can perform her past relevant work as a fusing machine tender and a hand packager. (*See id.* at 100-04; *compare id. with* Tr. 129-30 (vocational expert's hearing testimony that based on the hypothetical

---

[1]     The parties waived oral argument. (*Compare* Doc. 20 *with* Doc. 22.)

[2]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 21 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

posed, consistent with the ALJ's ultimate RFC determination, the claimant would be capable of performing her past relevant work as a fuser and hand packager)). On May 7, 2015, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 89-91) and, the Appeals Council denied Zanders' request for review on August 30, 2016 (Tr. 1-4).[3] Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due to anxiety, depression, paranoia, obesity, high blood pressure, headaches, back pain, hand pain, knee pain, foot pain, elbow pain, and medication side effects. The ALJ made the following relevant findings:

**1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.**

**2.      The claimant has not engaged in substantial gainful activity since November 5, 2012, the amended onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).**

**3.      The claimant has the following severe impairments: depression, anxiety, Raynaud's syndrome, and obesity (20 CFR 404.1520(c) and 416.920(c)).**

.      .      .

**4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20**

---

[3]      In the course of its decision denying Zanders' request for review, the Appeals Council evaluated certain medical evidence supplied by Plaintiff in the following manner: "We also looked at evidence from various sources. There is medical evidence, dated September 11, 2015 through February 25, 2016 received from West Alabama Mental Health Center (36 pages); medical evidence, dated May 5, 2015 through February 18, 2016 received from University Orthopaedic Clinic (34 pages); and medical evidence, dated February 26, 2016 received from Travis Clinic (2 pages). The Administrative Law Judge decided your case through March 11, 2015. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 11, 2015." (Tr. 2.)

**CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

.     .     .

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. During the psychological assessment under Dr. Tocci, the claimant had an appropriate appearance. She also independently bathed and dressed herself, feed herself, used the toilet, prepared meals, performed household chores, cared for her children, drove a car, shopped in stores, attended church, managed her own finances, read the Bible, and played volleyball. Thus, the claimant demonstrated the mental ability to initiate, sustain, and complete activities independent of direction or supervision. While the claimant's impairments may interfere with complex activities, the claimant's performance of a simple routine remained appropriate, effective and sustainable.

In social functioning, the claimant has moderate difficulties. The claimant demonstrated cooperative behavior, normal speech, good eye contact, and responsive facial expressions during her assessment with Dr. Tocci, even though her mood was "gloomy". She also displayed a pleasant and cooperative behavior during her assessments with Dr. Travis. The claimant further interacted with her children, regularly attended church, and shopped in stores. Thus, the undersigned determined she has retained the ability to communicate clearly, demonstrate cooperative behaviors, and sustain some social contact with others, based upon the preponderance of the evidence.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant did incorrectly calculate change during the examination with Dr. Tocci. However, her orientation, concentration/attention, memory, fund of information, abstract thinking,

thought processes, and insight/judgment remained intact. She also demonstrated having average intelligence. During treatment records, she denied problems with attention and concentration. Therefore, given such evidence, the undersigned determined the claimant could sustain the focus, attention, and concentration necessary to permit the timely and appropriate completion of tasks commonly found in routine and repetitive, not detailed or complex, work settings.

As for the episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The record revealed no extended psychiatric hospitalizations or frequent altering of psychotropic medications during this period of adjudication. Thus, there was no loss of adaptive functioning manifested by the claimant's inability to perform activities of daily living, maintain social relationships, or maintain concentration, persistence, or pace. Therefore, the undersigned determined the claimant has not had any episodes of decompensation within one year, or an average of once every four months, each lasting for at least 2 weeks, to support this functional limitation.

The above finding[s] are supported by the opinion of the state agency medical consultant, whose opinion is supported by the record and is entitled to great weight.

.        .        .

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant cannot climb ladders, ropes or scaffolds. She cannot kneel, crouch or crawl. She should avoid all exposure to cold, unprotected heights and hazardous machinery. The claimant can perform simple, routine and repetitive tasks involving simple work related decisions with few, if any, work place changes. She should avoid all direct contact with the general public. Work can be**

**around co-workers but with only occasional interaction with co-workers.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

.        .        .

The claimant alleged back pain, Raynaud's syndrome, and depression have continued to affect her ability to work. She stated her constant and severe (an 8 on a 10 point scale) back pain was the most limiting impairment. She claimed the onset of her back pain occurred in 2009. She reported a 3 to 4 year history of radiation of the pain into and numbness of the left leg. In addition, the claimant testified that Raynaud's syndrome has affected both of her hands ramping[] pain and an inability to extend her right ring finger; these symptoms have been present for the past 5 to 6 years. She also testified that she has problems with gripping things over the last five to six months, along with an inability to open jars. The claimant stated she has had an 8 to 9 year history of daily numbness in her feet; she attributed this symptom [] to Raynaud's syndrome. Furthermore, the claimant testified that she has been depressed for [the] last six to seven years. She stated her mental symptoms consisted of social isolation, avoidance of public places, fear of driving, crying

episodes, hearing voices (for four to five years occurring three to four times per week), and sleep difficulties (sleeping a total of four to five hours per day). She stated her sleep problems stemmed from her physical allegations and the need to check on her autistic son at night. The claimant testified that she has taken medications for anxiety and depression, and she admitted that these medications have helped her symptoms "a lot."

As to limitations, the claimant testified that she has been limited to lifting a gallon of milk for the last four years. She also alleged she could only walk 15 minutes and sit 15 to 20 minutes.

The claimant testified that she lived in a trailer with her three children, the youngest child being six years old. On a typical day, she testified to doing the following activities: waking up, getting the kids up for school, driving/dropping the kids off at school, going back home, cleaning the kitchen and doing the dishes, reading the Bible for 10 to 15 minutes, and crying while thinking upon things from her past. She claimed her sister did her hair, because she experienced elbow pain. She reported her mother and grandmother often prepared meals. She, however, admitted she cooked chicken and rice on the Friday prior to the hearing. The claimant testified that she shopped once per week (in the mornings to avoid people), washed light dishes, and washed/ironed clothes. She claimed her daughter primarily swept, mopped, and vacuumed. She alleged she last swept/mopped one year ago (2014). The claimant testified that she attended a two-hour church service every Sunday and Bible study on Wednesdays, once or twice each month. The claimant also stated she attended choir practice on a Saturday each month and sang in the choir once per month. She reported she has attended the same church since she was five or six years old, and she stated that she has felt confortable around the church members.

At the outset, the claimant's routine daily activities are consistent with the residual functional capacity. The claimant admitted to living with and being the primary caretaker of her minor children. She stated she prepared their meals, provided them with clean clothes, played with them, and drove them to school. She also performed light household chores, including washing dishes, cleaning the kitchen, making the beds, washing clothes, and cleaning the bathroom. She even admitted that she shopped in stores, read the Bible, for 10 to 15 minutes, counted change, handled a savings account, used a checkbook, played volleyball, walked, and traveled. The claimant also socialized amongst others while attending two-hour church services every Sunday and Bible study on[c]e or twice per month. She further completed a disability form by understanding and concentrating on each question and recalling situations before providing

the appropriate answers. Overall, these daily activities suggested the claimant could sustain work within the realms of the residual functional capacity. Thus, such evidence undermined the claimant's assertion of not being able to work entirely.

Pursuant to Social Security Ruling 02-1p, the undersigned did consider the physical effects of obesity and its potential to contribute to musculoskeletal, respiratory, and cardiovascular impairments. However, the record reflected no[] significant deficits compromising the claimant's body systems or her ability to work. She weighed 178 pounds at 64 inches with a body mass index of 30.55. Although the treating physician, Dr. Travis, noted right elbow tenderness on examination, the claimant maintained a full range of motion of all joints with good muscle mass (bilaterally) and no signs of atrophy or deformities. Thus, such evidence did not substantiate the claimant's debilitating back pain radiating to her left leg, in which Dr. Travis only prescribed a non-narcotic medication, Tramadol, for pain relief. The claimant also did not provide testimony regarding any knee complaints, and Dr. Travis' examination did not support this allegation either. The claimant's heart had a regular rate and rhythm, and her lungs remained clear to auscultation and percussion. The record essentially reflected no evidence of residuals from hypertension, including no stroke or any cardiovascular-related events. There were also no recurring crises or advancing organ damage related to uncontrolled blood pressure. In fact, the claimant's hypertension warranted only conservative treatment with medication. Hence, the record suggested obesity has not eliminated the claimant's ability to perform routine movement and necessary physical activities within a light work environment with the above-noted limitations addressed in the residual functional capacity. Thus, the residual functional capacity stated herein would accommodate the claimant's obesity, in spite of her physical allegations.

Given the claimant's allegations of bilateral hand numbness, the record reflected no clear interpretation of the electromyogram and nerve conduction studies. Dr. Ubogu provided no summarization of his findings to substantiate carpal tunnel syndrome or neuropathy occurring in the claimant's bilateral hands. Thus, there was essentially no evidence to warrant manipulative limitations or signs of atrophy. In fact, Dr. Ubogu noted the claimant had no neurological diagnosis. An examination revealed negative Tinel's sign and no sensory deficits [and] full range of motion. Examinations have shown full range of motion of all joints, all muscles functioning well and no atrophy. Thus, there is no medically determinable impairment due to carpal tunnel syndrome or numbness of the hands.

Although the claimant alleged she has exhibited crying spells, hearing voices, self-isolation, anxiety, and a depressed mood, she testified to having good outcomes with psychotropic medications. She stated her medications have "helped a lot". Treatment records support this testimony. In November 2014, the claimant noted that she was less depressed and less anxious and she was doing "OK" with medication. A mental status examination by the claimant's mental health counselor also reflects the claimant's appropriate appearance, adequate affect/mood, calm motor activity, adequate judgment and insight, and normal thoughts with no deficits in orientation or speech. There was also no evidence or mention of any hallucinations during the examination. In fact, the claimant denied having any psychological problems when she later visited Dr. Travis. She also presented a pleasant and cooperative demeanor with good hygiene. The above evidence implied the claimant's medication regiment was effective at controlling her mental symptoms. She has denied adverse medication side effects during treatment. Thus, the mental limitations set forth in the residual functional capacity would aid in the claimant's transition into the workforce. Such mental health success with medications supported the claimant's testimony.

The undersigned further considered the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

The undersigned [accorded] significant weight to the State agency's psychological consultant, Dr. Donald Hinton. He opined that the claimant's affective and anxiety disorders were severe. Thus, he concluded the claimant's functional limitations were as follows: mild restrictions in daily activities; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. He also opined that the claimant could understand, remember, and carry out simple instructions; interact with the general public as a form of routine contact, but not as a part of usual job assignments. In support of Dr. Hinton's opinions, the claimant engaged in [a] wide range of daily activities[,] including caring for minor children, handling her own finances, playing volleyball, preparing meals, performing household chores, driving, attending church regularly, and shopping in stores. Although she reported having social difficulty with some family members, along with a tendency [to] isolate herself from others, she remained pleasant and cooperative during her assessment with Dr. Travis. The claimant's mental health counselor also did not note any deficits in the claimant's speech, affect/mood, orientation, motor activity, thoughts, insight, or judgment while she adhered to prescribed treatment. There was further no evidence of inpatient psychiatric treatment due to her alleged mental complaints. Hence, Dr. Hinton's opinions were consistent and supportive of the record presented at the hearing level.

Dr. Travis opined the claimant would be limited to less than sedentary work with manipulative, postural and environmental limitations. Yet, she did not state an objective basis to substantiate her conclusions. Dr. Travis' own examination, <u>on the same date</u> she completed the medical source statement, showed no [ab]normal findings with the exception of cold fingers with cyanosis. Thus, there was essentially no deformities or swelling. She had good muscle mass, full range of motion in all joints, and no sign of atrophy. The claimant also engaged in various daily activities, as stated earlier. Therefore, the undersigned warranted little weight to Dr. Travis' opinions.

Dr. Tocci opined that the claimant has a global assessment of functioning score of 55, indicating moderate mental symptoms. The Commissioner specifically declined to endorse the GAF scale for use in disability programs, and stated that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings". Although her GAF opinion did somewhat support the record, it remained of little value in assessing the claimant's mental health record overall. Thus, the undersigned assigned little weight to her GAF score.

In sum, the medical evidence of record and the claimant's daily activities supported the residual functional [capacity] assessment. The claimant['s] statements/testimonies were not fully credible after a thorough review of the record in its entirety. Most opinion evidence supported the record as a whole during this period. Therefore, the undersigned finds the claimant has retained the ability to perform work consistent with the residual functional capacity established in this decision.

**6.     The claimant is capable of performing past relevant work as a fusing machine tender and a hand packager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

The claimant was born on June 6, 1977 and was 35 years old, which is defined as a younger individual, on the amended onset date (20 CFR 404.1563 and 416.963). The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964). She has acquired work skills through her past relevant work (20 CFR 404.1568 and 416.968). She performed this work at the substantial gainful activity level within the past 15 years. Consequently, such work lasted long enough for her to learn how to do the job (20 CFR 404.1565(a) and 416.965(a)). The earnings record, claimant's work history, and her testimony supported the duration, recency, and income threshold

requirements for her past relevant work (20 CFR 404.1574, 404.1575, 416.974, and 416.975).

Thus, based upon the <u>Dictionary of Occupational Titles</u> (<u>DOT</u>), Michael C. McClanahan, Ph.D., an impartial vocational expert, has classified the claimant's past relevant work as the following:

(1) Fusing Machine Tender (<u>DOT</u> 583.685-046), which is considered light, unskilled work with a specific vocational preparation (SVP) of two; and

(2) Hand Packager (<u>DOT</u> 559.687-074), which is considered light, unskilled work with an SVP of two.

Pursuant to SSR 00-4p, the undersigned finds the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Accordingly, in comparing the light residual functional capacity with the physical and mental demands of this work, the undersigned finds the claimant is able to perform it[] <u>as performed</u> and <u>as generally performed</u> in the national economy. This finding is based on the testimony of the vocational expert.

**7.     The claimant has not ben under a disability, as defined in the Social Security Act, from [November 5, 2012], through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).**

(Tr. 97, 98, 98-99, 100 & 101-05 (most internal citations omitted)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform h[is] past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Social Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[4] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to her past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that she cannot do his past relevant work, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform her past relevant work as a fuser and hand packager, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a

---

[4]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[5] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Sec.*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Zanders asserts four reasons the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred in failing to assign substantial weight to the opinions of the treating physician, Dr. Judy Travis; (2) the ALJ erred in failing to accord substantial weight to the opinion of Dr. Nina Tocci, a consultative examiner; (3) the ALJ erred in failing to conduct a full and fair hearing; and (4) the ALJ erred in failing to accurately consider the side effects of medications. In addition to these issues, Plaintiff contends that the Appeals Council failed to adequately examine additional evidence submitted to it.

A. **Opinions of Plaintiff's Treating Physician, Dr. Judy Travis**. On October 11, 2013, Dr. Travis completed both a Physical Medical Source Statement

---

[5]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

("PCE") and a Clinical Assessment of Pain ("CAP") form. On the PCE, Travis indicated that Zanders can sit for two hours at a time and a total of six hours in an eight-hour workday, stand and walk two hours at a time and walk for a total of four hours in an eight-hour workday,[6] frequently lift and carry up to five pounds, occasionally lift and carry up to 20 pounds, frequently use the hands for simple grasping and occasionally for fine manipulation and pushing and pulling of arm controls, frequently use the feet for pushing and pulling of leg controls, frequently stoop, crouch, kneel, crawl, and reach overhead, occasionally climb and balance, and she has a moderate limitation with respect to exposure to chemicals, noise, vibration, and dust, fumes and gases. (Tr. 604-05.) Travis did not specifically identify any specific diagnoses on the PCE; instead, she simply indicated that the limitations noted would be expected from the type and severity of the diagnoses in Zanders' case. (*Id.* at 606; *compare id. with* Tr. 604-05.) On the CAP, Travis again did not identify the specific impairments being treated or Plaintiff's specific symptoms; she simply indicated that: (1) pain is present to such an extent as to be distracting to adequate performance of daily activities; (2) physical activity—such as walking, standing, bending, lifting, etc.—would greatly increase Plaintiff's pain so as to cause distraction from or total abandonment of task; (3) there are either some medication side effects only mildly troublesome to Plaintiff or significant side effects which may limit effectiveness of work duties or performance of everyday tasks; (4) pain medications may cause some limitations but not to such a degree as to create serious problems in most instances; and (5) little improvement can be expected in regard to Plaintiff's pain and the pain is likely to worsen with time. (Tr. 607-08.) Travis also

---

[6]     Travis failed to indicate for how many total hours in an eight-hour workday that Plaintiff can walk. (*See* Tr. 604.)

indicated on this form that she had not treated Plaintiff with injections, nerve stimulation or bio-feedback. (*Id.* at 608.)

The law in this Circuit is clear that an ALJ "'must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error.'" *Nyberg v. Commissioner of Social Sec.,* 179 Fed.Appx. 589, 590-591 (11th Cir. May 2, 2006) (unpublished), quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986) (other citations omitted). In other words, "the ALJ must give the opinion of the treating physician 'substantial or considerable weight unless "good cause" is shown to the contrary.'" *Williams v. Astrue,* 2014 WL 185258, *6 (N.D. Ala. Jan. 15, 2014), quoting *Phillips, supra,* 357 F.3d at 1240 (other citation omitted); *see Nyberg, supra,* 179 Fed.Appx. at 591 (citing to same language from *Crawford v. Commissioner of Social Security,* 363 F.3d 1155, 1159 (11th Cir. 2004)).

> Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore* [*v. Barnhart*], 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert v. Commissioner of Social Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam).

In this case, the ALJ accorded little weight to the opinions set forth on the PCE Dr. Travis completed (Tr. 105).

> Dr. Travis opined the claimant would be limited to less than sedentary work with manipulative, postural and environmental limitations. Yet, she did not state an objective basis to substantiate her conclusions. Dr. Travis' own examination, <u>on the same date</u> she completed the medical source statement, showed no [ab]normal findings with the exception of cold

fingers with cyanosis. Thus, there was essentially no deformities or swelling. She had good muscle mass, full range of motion in all joints, and no sign of atrophy. The claimant also engaged in various daily activities, as stated earlier. Therefore, the undersigned warranted little weight to Dr. Travis' opinions.

(*Id.*)

The ALJ is absolutely correct in concluding that Dr. Travis' own medical records do not support her October 11, 2013 RFC assessment. As noted by the ALJ, Dr. Travis' physical examination findings on October 11, 2013 do not support her RFC assessment, Travis' only abnormal musculoskeletal finding being cold fingers with cyanosis (Tr. 613); otherwise, there were no other abnormal musculoskeletal findings (*see id.* ("Symmetrical. No deformities. No swelling. Good muscle mass bilaterally. Full range of motion of all joints. All muscles functioning well. No atrophy noted.")). Moreover, Travis' objective examination findings from the amended onset date (November 5, 2012) up to the date of the hearing decision (March 11, 2015) are consistent with respect to their failure to reveal any significant musculoskeletal findings (*see* Tr. 537 & 541 (physical examinations on July 24, 2013 and August 26, 2013 reflect the same exact objective findings as noted on October 11, 2013); Tr. 543 (no musculoskeletal examination performed on March 27, 2013 because Zanders had no complaints); Tr. 548 (physical examination on January 4, 2013 reflects the same exact objective findings as noted on October 11, 2013); Tr. 616 & 621 (physical examinations on November 1, 2013 and February 14, 2014 reflect the same exact objective findings as noted on October 11, 2013); Tr. 625 & 629 (physical examinations on June 16, 2014 and July 30, 2014 reflect some tenderness over the right elbow pronator but otherwise there was no deformity, no swelling, good muscle mass bilaterally, full range of motion

of all joints, and no atrophy noted); Tr. 723 (physical examination on January 22, 2015

revealed grinding of both knees with extension and flexion but otherwise no deformities

or swelling, good muscle mass bilaterally, no muscle atrophy, and full range of motion of

all joints); and Tr. 727 & 730 (physical examinations on December 18, 2014 and

November 3, 2014 reflect no deformities or swelling, good muscle mass bilaterally, full

range of motion of all joints, and all muscles functioning well, with no atrophy noted)). In

light of these insignificant objective medical findings, this Court cannot find that the ALJ

erred in affording little weight to the various opinions set forth on Dr. Travis' PCE. *See*

*Gilabert, supra,* 396 Fed.Appx. at 655 (good cause exists for not affording a treating

physician's opinion substantial or considerable weight where the treating physician's

opinion is inconsistent with her own medical records).[7]

      **B.**    **Opinion of Consultative Examiner Dr. Nina Tocci**. Plaintiff next

contends that the ALJ reversibly erred in failing to give substantial weight to the opinion

of consultative examiner Dr. Nina Tocci that "[a]fter one year of weekly psychotherapy

with a psychologist, Ms. Zanders would be capable of returning to employment and/or

nursing school[]" (Tr. 474-75). (Doc. 15, at 6-7.) Plaintiff points out that the ALJ wholly

failed to discuss this particular opinion of Dr. Tocci in her administrative decision and,

---

[7]      Although the Plaintiff sets forth Travis' CAP findings in her brief (*see* Doc. 15, at 3), she does not thereafter argue that the ALJ failed to give these findings appropriate weight. Presumably, this is because Plaintiff nowhere argues (or establishes) that the ALJ improperly analyzed her complaints of disabling pain. (*See* Doc. 15.) Nonetheless, the undersigned would simply note Plaintiff's lack of argument in this regard and, further, that Travis' failure to "tie" her pain assessment to specific impairments/diagnoses makes it impossible for this Court to "credit" the findings set forth on that form, particularly in light of Plaintiff's daily activities and the mostly normal observations by the physicians who physically examined her during the period from November 5, 2012 to March 11, 2015.

therefore, obviously failed to either discredit that opinion or indicate the weight she was affording the opinion. (*See id.*)

There can be little question but that "[w]eighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the process for determining disability." *Kahle v. Commissioner of Social Sec.,* 845 F.Supp.2d 1262, 1271 (M.D. Fla. 2012). In general, "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Sec. Admin.,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). In assessing the medical evidence, "[t]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor[,]" *Romeo v. Commissioner of Social Sec.,* 2017 WL 1430964, *1 (11th Cir. Apr. 24, 2017) (citing *Winschel v. Commissioner of Social Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011)), and the ALJ's stated reasons must be legitimate and supported by the record, *see Tavarez v. Commissioner of Social Sec.,* 638 Fed.Appx. 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

In this case, the ALJ certainly stated with particularity the weight she was affording Dr. Tocci's opinion regarding Plaintiff's GAF score (*see* Tr. 105 ("[T]he undersigned assigned little weight to [Dr. Tocci's] GAF score."));[8] however, as Plaintiff

---

[8]     Plaintiff makes no argument that the ALJ erred with respect to her analysis of Tocci's GAF score. (*See* Doc. 15, at 6-7.)

points out, the ALJ did not make any mention of Dr. Tocci's summary statement that "[a]fter one year of weekly psychotherapy with a psychologist, Ms. Zanders would be capable of returning to employment and/or nursing school." (*See id.; compare id. with* Tr. 474-75.) The Court finds that any error in this regard was merely harmless given that Tocci's statement in this regard is not a medical opinion but, instead, relates to Zanders' ability to work fulltime in a competitive environment (*see id.*); therefore, the ALJ was not required to afford that opinion any weight since it "goes to" a dispositive issue reserved to the Commissioner. *Compare Kelly v. Commissioner of Social Sec.,* 401 Fed.Appx. 403, 407 (11th Cir. Oct. 21, 2010) ("A doctor's opinion on a dispositive issue reserved for the Commissioner, such as whether the claimant is 'disabled' or 'unable to work,' is not considered a medical opinion and is not given any special significance, even if offered by a treating source[.]") *with Lanier v. Commissioner of Social Sec.,* 252 Fed.Appx. 311, 314 (11th Cir. Oct. 26, 2007) ("The ALJ correctly noted that the opinion that Lanier was unable to work was reserved to the Commissioner.").[9]

---

[9]     Furthermore, nothing about Tocci's objective observations of Plaintiff's mental status—that is, she was fairly groomed, had good eye contact, responsive/sad facial expressions, a cooperative attitude toward the examiner; an appropriate, normal and labile affect; she was oriented to time, place, person, and situation; she demonstrated focused attention and concentration; she had adequate memory; she demonstrated a good fund of information and comprehension; she demonstrated thought content appropriate to mood and circumstances and a logical thought organization; she demonstrated some insight into her behavior, fair social judgment in her consideration of two social dilemmas, and was capable of making informed personal and financial decisions; and appeared to be functioning within the average range of intellectual ability (Tr. 473-74)—are in any manner inconsistent with the ALJ's mental residual functional capacity assessment (*compare id. with* Tr. 100 ("**The claimant can perform simple, routine and repetitive tasks involving simple work related decisions with few, if any, work place changes. She should avoid all direct contact with the general public. Work can be around co-workers but with only occasional interaction with co-workers.**")) or the ultimate determinate that Plaintiff retains the residual functional capacity to perform the mental requirements of her past work as a fuser and hand packager (*see* Doc. 104).

**C.    Whether the ALJ Failed to Develop a Full and Fair Record.**  It is clear

that the ALJ essentially "shut down" the initial hearing in this case on August 25, 2014

(*see* Tr. 133-43) once it became clear that some evidence was missing from the record,

including that  there were no diagnostic results contained on a report of NCV/EMG

testing (*see id.* at 141-43). [10]  In closing that initial hearing, the ALJ made the following

comment: "[T]hat will give you [counsel] plenty of time . . . to get pharmacy records,

updated treatment records[.] [I]f for some reason the impression from the nerve

conduction study[,] there is not one, let me know and I'll consider what we need to do

with that. Whether we need to have a medical expert or not." (Tr. 143.) Plaintiff's

counsel advised the ALJ, by letter dated September 2, 2014, that there was still no

diagnostic impression on the NCV/EMG (*see* Tr. 647) and during the administrative

hearing on February 9, 2015, the following occurred:

>        ATTY:  . . .  I think one of the biggest issues [from the first hearing
> with respect to whether the evidence was fully developed] w[as] . . . the
> NC[V] Base Studies that were done by UAB and the[re] not being a
> diagnosis on the actual test results. And I got all of the records from UAB
> and written to you to say there's still no diagnosis on the actual test
> results. They were forwarded to Dr. Travis, since she's the one who
> referred Ms. Zanders to UAB for the test.
>
>        ALJ:  It looks like Dr. Travis's most recent records don't show any
> evidence – I mean there's no current evidence of carpal tunnel in the
> diagnosis.
>
>        ATTY:  Right. There's no mention of even the [N]CV test results in
> her records either, so . . . .

(Tr. 115-16.) The ALJ entered her opinion after the hearing without obtaining an opinion

for a medical expert, through a consultative examination, regarding whether the test

_____

[10]        The nerve conduction studies were performed on December 19, 2013. (Tr. 633-34.)

revealed evidence of carpal tunnel syndrome (*see* Tr. 103 ("Given the claimant's allegations of bilateral hand numbness, the record reflected no clear interpretation of the electromyogram and nerve conduction studies. Dr. Ubogu provided no summarization of his findings to substantiate carpal tunnel syndrome or neuropathy occurring in the claimant's bilateral hands. Thus, there was essentially no evidence to warrant manipulative limitations or signs of atrophy. In fact, Dr. Ubogu noted the claimant had no neurological diagnosis. An examination revealed negative Tinel's sign and no sensory deficits[, with] full range of motion. Examinations have shown full range of motion of all joints, all muscles functioning well and no atrophy. Thus, there is no medically determinable impairment due to carpal tunnel syndrome or numbness of the hands.")). As a result, Plaintiff contends that the ALJ erred in failing to fully and fairly develop the record, arguing a consultative examination was necessary for the ALJ to make an informed decision (Doc. 15, at 8-9).

Plaintiff is certainly correct that the regulations provide for a consultative examination when additional evidence is needed that is not contained in the records of her medical sources, where the evidence available from other sources cannot be obtained for a reason beyond the claimant's control (such as the noncooperation of a medical source), or when there is an indication of a change in condition that is likely to affect her ability to work, but the current severity of her impairment is not established. *See, e.g.,* 20 C.F.R. § 404.1519a(b)(1), (2) & (4) (2016). However, the regulations also provide that if information sufficient to make an informed disability decision can be obtained from the claimant's treating physicians and other medical sources, a consultative examination will not be necessary, *compare, e.g.,* 20 C.F.R. § 404.1512(e)

("Generally, we will not request a consultative examination until we have made every reasonable effort to obtain medical evidence from your own medical sources.") *with, e.g.,* 20 C.F.R. § 404.1517 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.") and 20 C.F.R. § 404.1519a(a) ("If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination."), and the Eleventh Circuit has consistently determined that an ALJ "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Commissioner of Social Sec.,* 496 F.3d 1253, 1269 (11th Cir. 2007) (citation omitted).

Initially, it need be noted that there is no evidence to suggest that Dr. Ubogu's diagnostic impression of the studies was unavailable to Plaintiff for a reason beyond her control; that is, there is nothing to suggest that Plaintiff attempted to obtain Dr. Ubogu's diagnostic impression but was unable to obtain it because of a lack of cooperation on Dr. Ubogu's end. Rather, all that happened is that Plaintiff again obtained the records of the studies from UAB and noted the lack of a diagnostic impression. (*See* Tr. 647.) Beyond this failure to act on Plaintiff's part, there is simply no evidence of record generated by Dr. Travis after the nerve conduction studies on December 19, 2013 to substantiate carpal tunnel syndrome or numbness of the hands caused by carpal tunnel syndrome.[11] Instead, Plaintiff's office visits to Dr. Travis on February 14, 2014, May 16,

---

[11]     After all, it was Dr. Travis who ordered the nerve conduction studies on November 1, 2013. (*See* Tr. 618 ("Instructions: BILATERAL UPPER LIMBS NERVE CONDUCTION STUDIES.")). (Continued)

2014, July 30, 2014, November 3, 2014, December 18, 2014, and January 22, 2015, reveal no assessment of carpal tunnel syndrome or numbness of the hands associated with carpal syndrome (*see* Tr. 621, 625, 629, 723, 727 & 730) and, importantly, reflect no musculoskeletal or neurologic problems with the hands beyond the notation on one visit (on February 14, 2014) of cold fingers with cyanosis (*see id.*). Indeed, Plaintiff's neurologic examination was consistently normal. (*See id.* ("Cranial nerves II-XII intact. Deep tendon and superficial reflexes are active and equal bilaterally. Sensorium clear.")). Given that the physician who ordered the nerve conduction studies generated no evidence after those studies were conducted to suggest that Plaintiff had carpal tunnel syndrome or numbness caused by carpal runnel syndrome, this Court simply cannot find that the ALJ reversibly erred in failing to develop the record by ordering a consultative examination in this case. *Cf. Childers v. Social Sec. Admin., Commissioner,* 521 Fed.Appx. 809, 815 (11th Cir. Jun. 6, 2013) ("Failure to fulfill this duty, however, only necessitates a remand if 'the record reveals evidentiary gaps which result in unfairness or clear prejudice.'"). In other words, such an examination was not necessary in order for the ALJ to make an informed decision because the records from Dr. Travis are sufficient to establish that Plaintiff either does not suffer from carpal tunnel syndrome or numbness of the hands as a result of carpal tunnel syndrome or, at the very least, do not supply any evidence supportive of manipulative limitations caused by carpal tunnel syndrome resulting in a more restrictive RFC determination than the finding made by the ALJ in this case. Accordingly, a remand is not necessary with respect to Plaintiff's third assignment of error.

_____

**D.** **Medication Side Effects.** Plaintiff contends that she complained to her physicians about side effects attendant to her psychiatric medications (*compare* Doc. 15, at 9 *with* Tr. 489, 516, 565 & 748) and since the record contains no evidence contradicting her allegations of side effects, her hearing allegations (*see* Tr. 139 ("My mouth is always dry, stomach ache, sometimes I have to be careful like when I go places, because if I take the medicine, it upsets my stomach and I have to use the bathroom. It makes me sleepy and groggy and dizzy.")) must be accepted as true and the decision denying benefits should be reversed (*see* Doc. 15, at 10), given that the administrative decision "is silent on the ALJ's evaluation of these side effects in her assessment of the RFC." (*Id.* at 9.)

The Eleventh Circuit has long made clear that "[i]t is conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker,* 662 F.2d 731, 737 (11th Cir. 1981). Consequently, as noted by Plaintiff (Doc. 15, at 9-10), the ALJ must consider medication side effects in evaluating a claimant's credibility about symptoms, *see, e.g.,* 20 C.F.R. § 404.1529(c)(3)(iv) ("Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. . . . Factors relevant to your symptoms, such as pain, which we will consider, include: . . . [t]he type, dosage, effectiveness and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]"), and in determining the claimant's RFC, *see* SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . restrictions imposed by the mechanics of treatment (e.g., . . .

side effects of medication[.]"). This makes sense, of course, because "when there is evidence in the record that the claimant is taking medications, and it is conceivable that the 'side effects of medication could render a claimant disabled or at least contribute to a disability,' the ALJ has an obligation to elicit testimony or make findings on the effects of the medications on the ability to work[.]" *Leiter v. Commissioner of Social Sec. Admin.,* 377 Fed.Appx. 944, 949 (11th Cir. May 6, 2010), quoting *Cowart, supra,* 662 F.2d at 737.

The undersigned concludes that the ALJ did not commit reversible error in her treatment of Plaintiff's alleged medication side effects. What is crucial to understand with respect to this assignment of error is that Plaintiff is simply incorrect in arguing that her medication side effects testimony is directed to the psychiatric medication she takes (*see* Doc. 15, at 9). Instead, a review of the hearing testimony, which is cited in Plaintiff's brief (*id.*), comes from Plaintiff's first hearing on August 25, 2014 (*see* Tr. 133-143), not her second hearing on February 9, 2015 (*see* Tr. 112-132), and it is clear that Zanders' August 25, 2014 testimony was directed to the medication she was then taking for her back pain, not the medication she was taking to combat her depression and anxiety (*see* Tr. 139 ("Q And if we look at a zero to ten scale, how would you classify your back pain? A About seven to eight. Q And has it been a seven to eight for the last four or five years? A Yes, ma'am. Q And are you taking any pain medication? A I take Lyrica, Tylenol and muscle relaxer. Q And do you have any side effects to any of the medications that you take? A Yes, ma'am. Q What side effects? A My mouth is always dry, stomach ache, sometimes I have to be careful like when I go places, because if I take the medicine[] it upsets my stomach and I have to use the bathroom. It makes me

sleepy and groggy and dizzy.")). Against this backdrop, and with the further realization

that the ALJ's decision only makes reference to the hearing (and testimony) conducted

on February 9, 2015 (*compare* Tr. 95 *with* Tr. 101-02), it is perfectly understandable

why the ALJ makes absolutely no reference to any medication side effects testimony

since the represented Zanders gave no testimony during her second administrative

hearing that medication side effects contribute to her disability (*see* Tr. 112-132). In

other words, because the testimony that matters is that given at the hearing on

February 9, 2015,[12] and the represented claimant did not mention her medication side

effects in response to the ALJ's questions about why she could not work (*see* Tr. 117-

21), the ALJ did not have to inquire into any alleged side effects and certainly did not

have to specifically evaluate or discredit medication side effect testimony that was not

given. *Compare Burgin v. Commissioner of Social Sec.,* 420 Fed.Appx. 901, 904 (11th

Cir. Mar. 30, 2011) ("Where a represented claimant raises a question as to the side

effects of medications, but does not otherwise allege the side effects contribute to the

alleged disability, we have determined the ALJ does not err in failing 'to inquire further

into possible side effects.' *Cherry v. Heckler,* 760 F.2d 1186, 1191 n.7 (11th Cir. 1985).

Further, if there is no evidence before the ALJ that a claimant is taking medication that

causes side effects, the ALJ is not required to elicit testimony or make findings

---

[12]    Plaintiff has not cited any case law establishing that the ALJ was required to
evaluate medication side effect testimony given at the "partial" hearing six months earlier, on
August 25, 2014, particularly since that testimony was directed to the pain medications she was
then taking and there is no evidence of record that Dr. Travis reported any side effects from
Zanders' medications or that Zanders complained to Dr. Travis about any side effects (*see* Tr.
611-30 & 721-31). *See, e.g., Swindle v. Sullivan,* 914 F.2d 222, 226 (11th Cir. 1990) (where
represented claimant did not complain about medication side effects, other than an isolated
mention that they might be responsible for causing her headaches, and where the record did not
disclose concerns about side effects from her doctors, substantial evidence supported the
determination that the effects did not present a significant problem).

regarding the medications and their side effects. . . . The record establishes the ALJ did not err by failing to consider the alleged side effects of Burgin's medications. Because Burgin was represented by counsel at his hearing, the ALJ was not required to inquire in detail about his alleged side effects. . . . Moreover, because there was no evidence Burgin was experiencing side effects form his medication, the ALJ was not required to make findings regarding his side effects when assessing his subjective complaints.") *with Colon ex rel. Colon v. Commissioner of Social Sec.,* 411 Fed.Appx. 236, 238 (11th Cir. Jan. 25, 2011) ("[W]here a represented claimant makes a similar statement, but does not otherwise allege that the side effects contribute to the alleged disability, we have determined that the ALJ does not err in failing 'to inquire further into possible side effects.' *Cherry v. Heckler,* 760 F.2d 1186, 1191 n.7 (11th Cir. 1985). The ALJ noted the obligation to consider the side effects of Mr. Colon's medications when assessing his subjective complaints and summarized the limited evidence in the record about the side effects. While Mr. Colon had reported some side effects from his medications in a disability report and his lawyer had given the ALJ a list of Mr. Colon's medications and their side effects, Mr. Colon did not mention his medication side effects in response to the ALJ's questions about why he could not return to work. Because Mr. Colon was represented at his hearing, the ALJ was not required to inquire further into Mr. Colon's alleged side effects[.]"). And given that Plaintiff's specific assignment of error in this regard is premised upon the ALJ's failure to discount the medication side effect testimony given on August 25, 2014, such that this testimony must be accepted as true (*see* Doc. 15, at 9-10), this Court can reach no other conclusion but that this assignment of error need be overruled, not only because the only testimony that matters is that

given at the February 9, 2015 hearing (and Plaintiff gave no medication side effect testimony) but, as well, because the medication side effect testimony from the initial hearing (on August 25, 2014) has no substantiation in the record.[13]

      **E.**    <u>**New Evidence Submitted to the Appeals Council.**</u> Zanders contends that the Appeals Council failed to adequately examine the additional evidence submitted to it, more specifically, those records supplied by Dr. Kevin Thompson, an orthopedic surgeon, relative to her right elbow and right knee. (*Compare* Doc. 15, at 11-12 *with* Tr. 46-77 & 83-86.) In particular, the Plaintiff criticizes the Appeals Council for "lumping" Dr. Thompson's records together with the other evidence submitted by her on appeal in making the following determination: "We also looked at evidence from various sources. There is medical evidence, dated September 11, 2015 through February 25, 2016 received from West Alabama Mental Health Center (36 pages); medical evidence, dated May 5, 2015 through February 18, 2016 received from University Orthopaedic Clinic (34 pages); and medical evidence, dated February 26, 2016 received from Travis Clinic (2 pages). The Administrative Law Judge decided your case through March 11, 2015. This

---

[13]      The undersigned also cannot agree with the Plaintiff that the ALJ's decision "is silent" with respect to "evaluation of [alleged] side effects in her [the ALJ's] assessment of the RFC." (Doc. 15, at 9.) Indeed, the ALJ in this case cited to Plaintiff's specific record denials of "adverse medication side effects" with respect to her psychiatric medication (Tr. 103 & 105 (citing Exhibit 25F, pp. 4, 6 & 11)) in support of the evaluation of the credibility of Plaintiff's various statements vis-à-vis the RFC determination. Therefore, even if plaintiff is correct that the records from West Alabama Mental Health Center contain some complaints of medication side effects (*see* Tr. 516 & 565 (notes reflect discussion between Zanders and the therapist about medication side effects but no specific delineation of the exact side effects); Tr. 489 (Zanders reported tiredness, headache and upset stomach but there is no specific link between these complaints and her psychiatric medications); Tr. 748 (note reflecting Zanders voiced complaints of dry mouth and occasional drowsiness but that no adverse reactions were observed)), those records are also replete with record denials of adverse medication side effects (*see, e.g.,* Tr. 549, 557, 567-68, 661, 665, 668, 678, 735-37, 742, & 746), such that this Court would necessarily have to determine that the ALJ's RFC assessment (which is inclusive of citation to some of the record denials of adverse medication side effects) is supported by substantial evidence.

new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 11, 2015." (Tr. 2.) According to Plaintiff, the Appeals Council erred in its review of the new evidence because "the allegations of both elbow and knee pain were made in the underlying claim. (Tr. 420, 421, 423, 433, 627, 629, 654, 657, 690, 692, 705, 707, 709, 713, 716, 720, 723, 725)[.]" (Doc. 15, at 12.)

The Eleventh Circuit has made clear that "[w]ith few exceptions, the claimant is allowed to present new evidence at each stage of th[e] administrative [review] process[,]" including before the Appeals Council. *Ingram, supra,* 496 F.3d at 1261. And while the Appeals Council has the discretion not to review the ALJ's denial of benefits, *Flowers v. Commissioner of Social Sec.,* 441 Fed.Appx. 735, 745 (11th Cir. Sept. 30, 2011), it "must consider new, material, and chronologically relevant evidence" submitted by the claimant. *Ingram, supra,* 496 F.3d at 1261*; see also* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").

> The new evidence is material if it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted). It is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b). If these conditions are satisfied, the Appeals Council [] must then review the case to see whether the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

*Ring v. Berryhill,* 2017 WL 992174, *4 (N.D. Ala. Mar. 15, 2017).

In *Flowers, supra,* the Eleventh Circuit made clear that "[w]hen a claimant properly presents new evidence, and the Appeals Council denies review, the Appeals

Council must show in its written denial that it has adequately evaluated the new evidence." 441 Fed.Appx. at 745 (citation omitted). Indeed, "[i]f the Appeals Council merely 'perfunctorily adhere[s]' to the ALJ's decision, the Commissioner's findings are not supported by substantial evidence and we must remand 'for a determination of [the claimant's] disability eligibility reached on the total record.'" *Id.,* quoting *Epps v. Harris,* 624 F.2d 1267, 1273 (5th Cir. 1980). The panel in *Flowers* ultimately concluded that the Appeals Council did not adequately consider the new evidence submitted by the claimant because "apart from acknowledging that Flowers had submitted new evidence, the Appeals Council made no further mention of it or attempt to evaluate it." *Id.*

However, since the decision in *Flowers*, subsequent panels of the Eleventh Circuit have indicated that where the Appeals Council accepts a claimant's new evidence but denies "review because the additional evidence fail[s] to establish error in the ALJ's decision[,]" that administrative body adequately evaluates the new evidence. *Mitchell v. Commissioner, Social Sec. Admin.,* 771 F.3d 780, 784 (11th Cir. 2014); *see also Beavers v. Social Sec. Admin., Commissioner,* 601 Fed.Appx. 818, 822 (11th Cir. Feb. 9, 2015) ("Here, the Appeals Council denied Worthy's petition for review, stating, as it did in *Mitchell*, that it had considered Worthy's reasons for disagreeing with the ALJ's decision and her new evidence, but found that the new evidence did not provide a basis for changing the ALJ's decision. Under *Mitchell*, no further explanation was required of the Appeals Council."). Indeed, the *Mitchell* panel noted that the Appeals Council "was not required to provide a detailed rationale for denying review." 771 F.3d at 784; *see also id.* at 784-85 ("We note that our conclusion that the Appeals Council is

not required to explain its rationale for denying a request for review is consistent with the holdings of other circuits that have considered this issue.").

These subsequent panel cases leave the viability of *Flowers* somewhat questionable given that, as noted by the court in *Flowers*, the Appeals Council "stated that it had considered Flowers's reasons for her disagreement with the ALJ's decision and her additional evidence[]" but "concluded 'that this information does not provide a basis for changing the Administrative Law Judge's decision.'" 441 Fed.Appx. at 740. This, of course, is the exact Appeals Council rationale upheld by later Eleventh Circuit panels in *Mitchell* and *Beavers* without need for further explanation/evaluation. *Compare id. with Mitchell supra,* 771 F.3d at 784-85 and *Beavers, supra,* 601 Fed.Appx. at 822.

With these principles in mind, the Court turns to Plaintiff's arguments relative to the Appeals Council's treatment of Dr. Thompson's treatment records which, as aforesaid, was, as follows: "We also looked at evidence from various sources. There is medical evidence, dated September 11, 2015 through February 25, 2016 received from West Alabama Mental Health Center (36 pages); medical evidence, dated May 5, 2015 through February 18, 2016 received from University Orthopaedic Clinic (34 pages); and medical evidence, dated February 26, 2016 received from Travis Clinic (2 pages). The Administrative Law Judge decided your case through March 11, 2015. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 11, 2015." (Tr. 2.) According to Plaintiff, these statements are inappropriate and do not demonstrate that the ALJ adequately evaluated the new evidence obtained from Dr. Thompson, thereby requiring

remand. (Doc. 15, at 11 (citing *Flowers, supra,* in arguing that the Appeals Council failed to show in its written denial that it had adequately evaluated the new evidence)). This Court cannot agree with Plaintiff's very general argument because, as alluded to earlier, Eleventh Circuit panel opinions subsequent to *Flowers* have called into question any remaining viability of *Flowers*, *compare Mitchell, supra,* 771 F.3d at 784-85 *with Beavers,* 601 Fed.Appx. at 822; therefore, this Court cannot agree with any suggestion by Zanders that the language utilized by the Appeals Council was inappropriate and does not demonstrate that it adequately evaluated the new evidence, *see Beavers, supra*. This conclusion is confirmed by more recent cases in which district courts have given no indication that language all but identical to that utilized by the Appeals Council in this case amounts to perfunctory language that does not demonstrate adequate/meaningful evaluation of the new evidence. *Compare Putman v. Colvin,* 2016 WL 5253215, *10-11 (N.D. Ala. Sept. 22, 2016) (distinguishing *Flowers* and "automatic remand" in a case in which the Appeals Council, in addition to stating "'this information does not provide a basis for changing the [ALJ's] decision[,]'" also "went on to explain that the ALJ 'decided your case through March 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.'") *with Matos v. Colvin,* 2015 WL 5474486, *5 (M.D. Fla. Sept. 17, 2015) ("The Appeals Council determined that the December 2012 opinion of Dr. Reeves did not provide a basis for changing the ALJ's decision because: 'The Administrative Law Judge decided your case through December 31, 2010, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it

does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.' . . . Here, the opinion is dated almost two years after the date last insured and there is no indication from Dr. Reeves that the limitations he found in 2012 were present two years earlier. Indeed, there is a dearth of evidence prior to the expiration of Plaintiff's insured status that could support these limitations. The only evidence Plaintiff cites is a November 29, 2010 x-ray which revealed *moderate* degenerative changes, soft tissue swelling and ossified bodies along the medial joint []. There is no finding of the 'significant subtalar joint arthrosis' presented two years later. The Appeals Council applied proper standards of law and its conclusion is supported by substantial evidence."); *see Hunter v. Colvin,* 2013 WL 1219746, *4 (S.D. Ala. Mar. 25, 2013) ("Here, the Appeals Council could have meaningfully addressed the plaintiff's new evidence by, for example, specifically rejecting it because (in its view) the new evidence did not relate to the period at issue."). Implicit in *Putman* and *Matos* is the recognition that the Appeals Council's language, which is identical to the language used by the Appeals Council in this case (save that instead of referencing the date last insured, the Appeals Council referenced the date of the hearing decision, March 11, 2015), is directed to materiality and/or chronological relevance and, therefore, is not an inadequate/perfunctory evaluation of the evidence requiring remand under *Flowers* and its progeny. *See Putman, supra,* at *10-11; *Matos, supra,* at *5.[14] Accordingly, Plaintiff's argument in this regard fails.

---

[14] This Court simply cannot discern any error with the Appeals Council evaluation of the evidence presented to it by Dr. Thompson in this case. It is clear, as aforesaid, that "[n]ew evidence is chronically relevant if 'it relates to the period on or before the date of the administrative law judge hearing decision.'" *Stone v. Social Sec. Admin., Commissioner,* 658 Fed.Appx. 551, 553 (11th Cir. Oct. 19, 2016) (citation omitted). It is also clear that "[u]nder (Continued)

There being no other claims of error asserted, the Court finds that the Commissioner's final decision denying Zanders benefits is due to be affirmed.

## CONCLUSION

In light of the foregoing analysis, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 28th day of August, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**

---

certain circumstances, medical examinations conducted after the ALJ's decision may still be chronically relevant, if they relate back to a time on or before the ALJ's decision." *Id.,* citing *Washington v. Social Sec. Admin., Commissioner,* 806 F.3d 1317, 1320 (11th Cir. 2015). The undersigned has thoroughly reviewed the medical examination evidence from Dr. Thompson that was submitted to the Appeals Council (*see* Tr. 46-77 & 83-86) and simply finds nothing therein which "ties" that evidence to a time on or before the ALJ's (*see id.*) and, indeed, there is nothing contained in Thompson's records that would appear to undermine the ALJ's RFC determination. While Plaintiff may well have occasionally complained of right elbow and knee pain to her treating and examining physicians (*see, e.g.,* 420 (elbow pain); 627 (elbow pain); 690 (elbow pain); 705 (elbow pain); 709 (soreness of elbow); 716 (right elbow pain); 721 & 723 (bilateral knee pain with grinding on extension and flexion); 725 (elbow pain)) during the relevant time period, these complaints were minor compared to Plaintiff's symptomatic complaints about her back and hands and, indeed, at the hearing on February 9, 2015, Zanders made no mention of her right elbow or knee pain in describing those conditions which contribute to her disability, though given an open avenue to do so (*see* Tr. 122 (Q Anything else that we haven't talked about that you'd like to tell me? A No, ma'am."); *compare id. with id.* at Tr. 117-122 (Plaintiff identified back pain as her most severe impairment, which produced numbness in her left leg, and then identified Raynaud's disease in her hands, anxiety, depression, and problems with her feet as additional conditions which interfere with her ability to work)). And because the records from Dr. Thompson include no express reference to Zanders' knee and elbow condition and symptoms before the ALJ's decision, this Court cannot find that Zanders has shown that Thompson's records are chronologically relevant, nor has she established that the manner in which the Appeals Council evaluated the evidence presented to it from Dr. Thompson was so inadequate or perfunctory as to require remand under *Flowers* and its progeny.